In re Twana BOYD, Debtor.

Dieter Weeber, Plaintiff,

v.

Twana Boyd, Defendant.

No. 03–3488.

United States Bankruptcy Court,
N.D. Ohio.

July 28, 2004.

Order denying motion to amend
Aug. 20, 2004.

Fredric M. Boyk, Toledo, OH, for debtor.

## MEMORANDUM OPINION AND DECISION

RICHARD L. SPEER, Bankruptcy Judge.

This cause comes before the Court after a Trial on the Plaintiff's Complaint to determine the dischargeability of a debt. The Plaintiff brings this suit pursuant to three statutory exceptions to discharge: 11

U.S.C. §§ 523(a)(2)(A), (a)(4) and (a)(6). At the conclusion of this Trial, the Court permitted the Parties to file Post–Trial Briefs, which both the Parties have now done. After reviewing these briefs, together with all of the evidence presented in this case, the Court, for the reasons that will now be explained, finds that the debt at issue is Dischargeable under bankruptcy law.

## FACTS

The Plaintiff, Dieter Weeber, and the Debtor/Defendant, Twana Boyd, met in 1995 after the Plaintiff answered a personal ad placed by the Debtor (hereinafter the Parties will be referred to respectively as the "Plaintiff" and the "Debtor"). From this initial contact, the two began a relationship. During the course of their relationship, the Debtor borrowed $3,200.00 from the Plaintiff to start a small business. This business, however, later failed after which time the Debtor, in a filing previous in time from the Debtor's instant bankruptcy case, sought relief under Chapter 7. Based upon her bankruptcy discharge, the Debtor ceased payments on her loan to the Plaintiff. At or around this time, their relationship ended.

Some years later, and for reasons not entirely clear, the Parties resumed their relationship. At approximately the same time, the Debtor was looking to purchase a new car. During a dinner, the Plaintiff and Debtor discussed this future purchase. At this time, the Debtor explained that she could only obtain a high interest rate loan. The Plaintiff, with the belief that he could obtain a lower rate of interest by financing the vehicle through obtaining a home equity loan, offered to lend the money needed to purchase the car, insisting, however, that he retain a lien in the vehicle.

To effectuate their agreement, the Plaintiff drafted a preliminary note which outlined its purpose, the amount to be borrowed ($19,150.00), and the fact that the note would be secured by the vehicle to be purchased by the Debtor. The Parties, however, delayed drawing up a final agreement until the Plaintiff could secure a home equity loan and thus would know the applicable interest rate. In the meantime, the Plaintiff utilized money from a brokerage account to obtain the funds necessary to fund the purchase of the auto.

At the time of the purchase, the Parties took the preliminary agreement with them to the dealership where it was signed by the Debtor with a sales associate acting as a witness. During this transaction, the Plaintiff requested that a lien.be placed on the title but, for reasons uncertain, this could not be accomplished. Notwithstanding, the Plaintiff still advanced the necessary money to purchase the car, with the title to the vehicle being placed exclusively in the Debtor's name. Based upon this set of circumstances, the Debtor agreed, as soon as practically feasible, to take the appropriate measures to have a lien placed on the vehicle in Plaintiff's favor.

Contrary to the Parties' preliminary agreement, however, and despite the Plaintiff's repeated requests through letters and phone calls during the ensuing ten months, the Debtor made only four payments on the loan obligation. In addition, the Debtor never took the appropriate measures to have the necessary lien placed on the vehicle. In light of these breaches, the Plaintiff eventually proceeded to take legal measures against the Debtor, thereafter obtaining a judgment for the outstanding balance of the loan in December of 2002. As these events were occurring, the Debtor had only sporadic contact with the Plaintiff which she attributed to her state of depression. However, despite having infrequent contact, the Debtor explained it was her understanding

that her "relationship" with the Plaintiff was still ongoing, and that based upon their continued relationship, her debt to the Plaintiff was to be forgiven or at the very least deferred.

In October 2002, the Debtor undertook to obtain a personal loan, seeking to use the car as collateral. At this time, the Debtor discovered that, although titled in her name, she did not have physical possession of the title to the car. As a result she applied for and then obtained a replacement title; failing, however, to make any notation of the Plaintiff's interest in the vehicle. Thereafter, the Debtor presented to a finance company an unencumbered title to the vehicle. The Debtor also completed a loan agreement which, contrary to the information requested, did not include information about a supposed lien in favor of the Plaintiff or the judgment pending against her. Based upon these representations, the Debtor was able to obtain a loan with the finance company, who then placed a first and best lien on the vehicle.

In April 2003, the Plaintiff, with police officers escorting him, went to the Debtor's home to repossess the car. Due, however, to the fact that the Debtor had received a replacement title to the vehicle, the police informed the Plaintiff that title to the vehicle was indeterminate, and thus he could not repossess the car that day. Notwithstanding, the Plaintiff at a later time, upon receiving a duplicate key from the car dealership, had a tow company deliver the car to his house. Upon discovering that her car was missing, the Debtor called the police who informed her that the car was in the Plaintiff's possession. The Debtor claims that it was during these events that she first became aware of the judgment against her. She then took steps and was later successful in having the Plaintiff's judgment vacated.

On September 9, 2003, the Debtor, again, filed for protection under Chapter 7 of the United States Bankruptcy Code. In her bankruptcy petition, the Debtor listed the Plaintiff as a creditor. On December 2, 2003, the Plaintiff commenced this action to hold his claim nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6).

## *LAW*

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-
>
> > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
>
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]

## *DISCUSSION*

■ In the instant case, the Plaintiff seeks a finding that his claim against the Debtor is a nondischargeable debt. Pursuant to 28 U.S.C. § 157(b)(2)(I), this type of action is deemed a core proceeding over which this Court has been conferred with the jurisdictional authority to enter final orders. 28 U.S.C. § 1334.

■ The Plaintiff brings his Complaint under three provisions of 11 U.S.C. § 523(a): (1) § 523(a)(2)(A), a debt arising from a false pretense, a false representation, or actual fraud; (2) § 523(a)(4) a debt arising from fraud or defalcation while acting in a fiduciary capacity, embezzlement,

or larceny; and (3) § 523(a)(6), a debt arising from a willful and malicious injury. Together, these sections of the Bankruptcy Code implement the long-standing policy that only those debts which are honesty incurred are entitled to the benefits of a bankruptcy discharge. *FTC v. Austin (In re Austin)*, 138 B.R. 898, 903 (Bankr. N.D.Ill.1992). However, so as to also further the fresh-start policy of the Bankruptcy Code, these exceptions are narrowly construed. *See, e.g., Griffith, Strickler, Lerman, Solymos & Calkins v. Taylor (In re Taylor)*, 195 B.R. 624, 627 (Bankr. M.D.Pa.1996). In conformance therewith, the Plaintiff bears the burden to establish, by a preponderance of the evidence, the applicability of these sections. *Staniunas v. Delisle (In re Delisle)*, 281 B.R. 457, 463 (Bankr.D.Mass.2002). The Court will now address these sections in turn.

In order to sustain a cause of action under § 523(a)(2)(A), the creditor must establish the existence of the five common law elements of fraud. *Chase Manhattan Bank v. Alnajjar, (In re Alnajjar)*, 276 B.R. 844, 848 (Bankr.N.D.Ohio 2002). These elements are: (1) the debtor made a false representation; (2) the debtor knew such representation to be false at the time they were made; (3) the representation was made with intent to deceive the creditor; (4) the creditor justifiably relied on the representation; and (5) the creditor's loss was the proximate result of the misrepresentation having been made. *Bernard Lumber Co. v. Patrick (In re Patrick)*, 265 B.R. 913, 916 (Bankr. N.D.Ohio 2001). As is common, only elements three and four are in dispute: whether the Debtor acted with the requisite intent to defraud and whether the Plaintiff was justified in relying on the Debtor's representation.

At the center of the fraud exception to discharge under § 523(a)(2)(A) is the element of intent. In situations such as this where a debtor obtains goods or services on credit, a debtor will be found to have acted with the requisite intent to deceive a creditor when, at the time the debt was incurred, it is established that the debtor never had any intention of repaying the debt. *Clyde–Findlay Area Cr. Union v. Burwell (In re Burwell)*, 276 B.R. 851, 854 (Bankr.N.D.Ohio 2002). As it applies to this inquiry, the Sixth Circuit Court of Appeals has held that a debtor's intent must be measured by a subjective standard. *Rembert v. AT & T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir.1998). However, because rarely, if ever, will a debtor admit to acting with the intent to defraud, circumstantial evidence may still be used and is usually necessary to establish what the debtor's state of mind was at the time of the alleged fraud. In this regard, an examination of the traditional badges of fraud—i.e., the timing of the event—is helpful. In looking at such indicia of fraud, a court may consider not only information relating to the debtor's conduct at the time of the representation, but also any evidence relating to a debtor's subsequent conduct, to the extent that such conduct provides an indication as to the debtor's state of mind at the time of the actionable representation. *In re Patrick*, 265 B.R. at 916. Finally, once all of the evidence is produced, a bankruptcy court must then determine whether the circumstances, as viewed in the aggregate, present a picture of deceptive conduct by the debtor. *Id.* at 916–17.

The Plaintiff's position concerning the Debtor's mal intent focuses on events subsequent to the Parties' transaction. Of primary concern, the Plaintiff pointed to the fact that the Debtor, contrary to the Parties' agreement, failed to take the necessary steps to have the Plaintiff's lien

perfected. And, facially the Court agrees this is indicative of fraudulent intent; a debtor who, shortly after the exchange of consideration, fails completely to make any attempt to work with the creditor is likely not entering the transaction honestly. However, additional facts in this case show that this is not the full story.

To begin, contrary to the picture painted by the Plaintiff, the Debtor did not completely disappear out of his life so as to make the finalization of their agreement impossible. Rather, there were ten or so social meetings that occurred between the Parties after the purchase of the vehicle. During this period of time, the Plaintiff appears to have forgone any attempt to either perfect the lien on the vehicle, draft the final agreement, or collect on the loan. In turn, this supports the Debtor's assertion that if their "relationship" continued, then her debt would be forgiven or at the very least she would have a grace period for paying back the loan. Given, therefore, this social arrangement, it is difficult for the Court to make an accurate assessment as to whether the Debtor was intentionally eluding her responsibility or whether the Debtor and the Plaintiff were seeking, based upon the progression of their "relationship," a novation as to their original agreement.

In addition to the above conduct, the Plaintiff continued his argument by pointing to the Debtor's act of acquiring a subsequent personal loan using, in violation of their agreement, her vehicle as collateral. However, again, any inference of fraud that may be derived from this act is called into question by the fact that the Debtor made a further payment to the Plaintiff after obtaining the personal loan. Importantly, this payment does not appear to have been made under duress. For example, it was apparently made without the knowledge of the state court action that the Plaintiff had commenced against her. This evidence, thus, tends to show a lack of any direct correlation between the Debtor borrowing money from the finance company and the nonpayment on the Plaintiff's claim. The further payments also raise this question: If the Debtor intended to deceive the Plaintiff, why did she continue to make payments, albeit not an significant amount, on the debt?

■ When set against the maxim that doubts concerning dischargeability should be resolved in favor of the debtor,[1] the Court, although finding it a rather close call, finds that the above mitigating considerations sufficiently refute the *prima facie* case the Plaintiff made against the Debtor for fraudulent intent. As a result, the Court cannot find that the Plaintiff has carried his burden under § 523(a)(2)(A). However, even assuming for argumentative sake that this were not the case, as the following will explain, the Plaintiff has also failed to meet his burden under the fourth common law element of fraud: Reliance.

■ In *Field v. Mans*, the Supreme Court of the United States held that the standard of reliance needed under § 523(a)(2)(A) is that of justifiable, as opposed to the higher standard of reasonable reliance. 516 U.S. 59, 74–75, 116 S.Ct. 437, 446, 133 L.Ed.2d 351 (1995). The difference between the two standards is that the former is subjective, whereas the latter standard is objective. In *Eugene Parks Law Corporation Defined Benefit Pension Plan v. Kirsh (In re Kirsh)*, which was favorably cited by the Supreme

1. *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997).

Court in *Field v. Mans,* the Ninth Circuit Court of Appeals explained justifiable reliance as this:

the standard is not that of the average reasonable person. It is a more subjective standard which takes into account the knowledge and relationship of the parties themselves. Thus, a person of normal intelligence, experience and education may not put faith in representations which any such normal person would recognize at once as preposterous. At the same time, the standard does protect the ignorant, the gullible, and the dimwitted, for no rogue should enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool. On the other hand, if a person does have special knowledge, experience and competence he may not be permitted to rely on representations that an ordinary person would properly accept. In other words, while reasonableness of behavior is a factor in the mix, it is only a factor. The more precise question is whether the person who claims to have been gulled was justified in relying.

973 F.2d 1454, 1459 (9th Cir.1992) (internal citations and quotations omitted).

As applied here, the evidence presented shows that the Plaintiff had special knowledge of the Debtor's financial situation and the possibility of nonpayment due to the fact that on a previous occasion he had loaned her money. Telling in this regard, the circumstances of the earlier loan were very similarly to the present one; the Debtor, upon finding herself unable to pay, filed bankruptcy and obtained a discharge from the Plaintiff's claim, thereafter declining to take advantage of 11 U.S.C. § 524(f) which provides that nothing "prevents a debtor from voluntarily repaying any debt." Hence, with the more recent loan, the Plaintiff had to acutely appreciate the risk involved in loaning the Debtor money. But still, six years later, upon finding the Debtor in a vulnerable position, inasmuch as she could only get a high interest rate loan for a car, the Plaintiff nevertheless agreed to again loan her more money.

In response to this conduct, which has elsewhere been described as naif, the Plaintiff put forth that he was justified in relying upon the Debtor's representation of repayment because he was to have a security interest in the car. While possibly a valid point, this statement must fail here because when the Plaintiff discovered that a lien could not be placed on the vehicle in his favor, he still continued with the transaction, loaning the Debtor in excess of $19,000.00. Explained differently, when the terms of the Parties' agreement could not be fully effectuated—i.e., by having a lien placed on the vehicle—and the Plaintiff had the opportunity to terminate the transaction, he declined to do so.

Based upon the above observations, the Plaintiff is not the picture of a naive suitor who got duped. Rather, it is this Court's judgment that the Plaintiff possessed the special knowledge the Supreme Court in *Field* anticipated when they set down in their Opinion that justifiable reliance is not without its limits in that a person is "required to use his senses and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him." *Field,* 516 U.S. at 71, 116 S.Ct. 437. As will now be briefly explained, the Plaintiff's causes of action under §§ 523(a)(4) and (6) also lack merit.

Under § 523(a)(4), there are three possible types of debts that will be excepted from discharge: (1) debts for fraud or defalcation while acting in a fiduciary capacity; (2) debts for embezzlement; and (3) debts for larceny. In turn, § 523(a)(6) provides that a debtor's discharge must be denied when there has

been a "wilful and malicious injury by the debtor to another entity or to the property of another entity." Except for the defalcation exceptions to discharge, which requires the existence of a "fiduciary relationship," all these grounds for nondischargeability, whether under § 523(a)(4) and (6), have an element in common with § 523(a)(2)(A): the existence of scienter—the specific *intent* to actually do harm. *In re Stephens,* 51 B.R. 591 (9th Cir. BAP 1985).

As applied to this case, however, no assertion was made, and none could be discerned, that a "fiduciary relationship" existed between the Plaintiff and the Debtor. More importantly, besides the evidence just discussed relating to the Debtor's fraudulent intent under § 523(a)(2)(A), no additional evidence was presented concerning the Debtor's intent that was specific to either § 523(a)(4) or § 523(a)(6). Accordingly, as the Plaintiff failed to establish a specific intent to do harm under § 523(a)(2)(A), the Plaintiff's case must likewise fail under both §§ 523(a)(4) and (6).

On a final point of order, the Plaintiff included in his pleadings a cause of action to deny the Debtor's discharge under 11 U.S.C. § 727(a)(4). However, the evidence presented at Trial did not substantively address this cause of action and thus will not be discussed. In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Opinion.

Accordingly, it is

**ORDERED** that the loan obligation of the Defendant, Twana Boyd, to the Plaintiff, Dieter Weeber, be, and is hereby, determined to be a DISCHARGEABLE DEBT.

It is **FURTHER ORDERED** that the Plaintiff's Complaint be, and is hereby, DISMISSED.

## DECISION AND ORDER

Before this Court are the Plaintiff's dual Motions: a Motion for Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052; and a Motion to Alter or Amend this Court's Judgment pursuant to Bankruptcy Rule 9023. As it pertains thereto, the Debtor/Defendant filed a Motion in Opposition, and a Request for Ruling on its Counterclaim. For the reasons set forth herein, the prior decision of this Court will stand.

The Plaintiff's dual Motions pertain to this Court's prior decision wherein judgment was entered unfavorably on the Plaintiff's Complaint pertaining to the dischargeability of his individual claim. In this Decision, the Court also stated:

> [o]n a final point of order, the Plaintiff included in his pleadings a cause of action to deny the Debtor's discharge under 11 U.S.C. § 727(a)(4). However, the evidence presented at Trial did not substantively address this cause of action and thus will not be discussed.

(Doc. No. 21, at pg. 10). Although a further review of the evidence does not reveal any substantive matters that were overlooked, the Court, in accordance with Bankruptcy Rule 7052, sets forth the following findings of fact and conclusions of law on the matter. Also incorporated herein, are those findings made in this Court's prior decision dated July 28, 2004 and constituting docket number 21.

## FACTS

The Plaintiff, who has a child 10 years of age, has worked as a meter reader for approximately 21 years. In October of 2002, the Debtor represented, in a loan

application, that her gross monthly pay was $2,743.00. (Pl.Ex. No. 5).

On her 2002 federal income tax return, the Debtor listed her gross wages as $33,746.00, or 2,812.16 per month. (Pl. Ex. No. 9A). On her 2003 federal income tax return, the Debtor listed her gross wages as $34,909.00, or $2,909.08 per month. (Pl.Ex. No. 9B).

In her bankruptcy petition, the Debtor listed a monthly expense for electricity and heating fuel at $200.00 per month. A payment history of the Debtor's gas bill showed that the Debtor was paying between $120.00 to $160.00 a month on her gas bill, but had an arrearage of over $1,000.00. (Pl.Ex. No. 11). With respect to electricity, the Debtor was paying approximately $70.00 per month, but had an arrearage of over $700.00. (Pl.Ex. No. 13).

At the time of the Trial held in this matter, the Debtor had an expense of approximately $50.00 per month to repay two 401(k) loans whose aggregate principal sum was $3,000.00. (Pl.Ex. No. 12). In her original bankruptcy petition, the Debtor listed this expense at $215.32.

In her bankruptcy petition, filed in this Court on September 9, 2003, the Debtor represented that her gross monthly pay was $2,818.40, with a net pay of 2,254.46. The Debtor listed her total monthly expenses at 2,242.00. (Doc. No. 1). Prior to the meeting of creditors, the Debtor amended her bankruptcy petition on two separate occasions.

On the second amendment, the Debtor submitted updated expense and income figures. These figures show the Debtor's gross monthly income at $2,818.40, with a net pay of $2,434.46. The Debtor's monthly expenses were revised to $2,432.00. Although there were some other minor variations, the substance of these revisions stemmed from a $100.00 decrease in an employer insurance deduction, an employer mileage allowance of $180.00, an additional 401(k) repayment expense of $117.00, a business car expense of $125.00, an increase in day care by $60.00 and an increase in life insurance of $66.00. (Doc. No. 4).

The Plaintiff filed his Complaint on December 2, 2003. After filing his Complaint, the Debtor submitted revised income and expense figures to the Plaintiff, which again, and similar to the above, showed some variations in the Debtor's income and expenses.

## LEGAL ANALYSIS

■■■ At issue here is the applicability subparagraph (A) of § 727(a)(4) which provides, "[t]he court shall grant the debtor a discharge, unless the debtor knowingly and fraudulently, in or in connection with the case made a false oath or account[.]" This statute is based on the fundamental principle of bankruptcy law that, in return for receiving the protections of the discharge injunction, a debtor must make a full, complete and accurate disclosure of all required financial information. *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 967 (7th Cir.1999). As taken directly from the above statutory language of § 727(a)(4)(A), five elements must be established to deny a debtor's discharge: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with the intent to deceive; and (5) the statement related materially to the bankruptcy case. *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 685 (6th Cir.2000). It is the Plaintiff's burden to establish the existence of each of these elements by at least a preponderance of the evidence. *Hamo v. Wilson (In re Hamo)*, 233 B.R. 718, 724 (6th Cir. BAP

1999). In looking at this burden, a court must proceed on the presumption that a debtor is entitled to the benefits of the bankruptcy discharge. *Baker v. Reed (In re Reed),* 310 B.R. 363 (Bankr.N.D.Ohio 2004).

■ Upon applying the evidence to these elements, the first is unarguably met; information (or the omission thereof) set forth in a debtor's bankruptcy schedules qualifies as a statement made under oath. *Crawford v. Monfort, (In re Monfort),* 276 B.R. 793, 796 (Bankr.N.D.Ohio 2001). Beyond this, however, the Plaintiff has not carried his burden.

■ In arguing for the applicability of § 727(a)(4)(A), it is the Plaintiff's overall position that the Debtor attempted, through various overstatements and understatements of her income and expenses, to disguise available income that was available to service her debts. (Doc. No. 23, at pg. 2). To support this position, the Plaintiff relies on variations in those income and expense figures submitted to the Court, and the lack of a proper accounting thereof. And, there is no actual dissension from the Debtor that those income and expense figures put before the Court exhibited, over a relatively short period, a number of variations. Alone, however, variations in a debtor's reported income and expenses neither establish the falsity of the figures, nor that the debtor, with knowledge as to their falsity, acted with the intent to deceive. The reasons for this are straightforward.

■ To begin with, bankruptcy law specifically permits a debtor to make postpetition amendments to his or her petition. FED.R.BANK.P. 1009. In turn, this is simply the mechanism which implements the general bankruptcy policy that a debtor, until his or her case is fully administered, is under a continual duty to make full, complete and accurate disclosure of all required information. With respect to a debtor's income and expenses, postpetition fluctuations are common which, in conformance with the continual duty of disclosure, must be disclosed if they are material in nature. Consequently, to subsume an inference of fraud based simply on a debtor's submission of revised income and expense figures—in essence, punishing the debtor for complying with his or her continual duty of disclosure—runs contrary to bankruptcy policy.

■ On the other hand, the postpetition disclosure or the amending of information not originally disclosed by a debtor in their bankruptcy original petition may still be a potential consideration bearing on the debtor's honesty. *Banc One, Texas, N.A. v. Braymer, (In re Braymer),* 126 B.R. 499, 501 (Bankr.N.D.Tex.1991) (original petition and schedules are generally the yardstick by which § 727(a)(4)(A) actions are measured). On this matter, and contrary to what may be an emerging practice of some debtors, the subsequent disclosure of information omitted from a bankruptcy petition will *not* undo a prior transgression; the tenet of no harm, no foul, does not apply. *Nat'l American Ins. Co. v. Guajardo (In re Guajardo),* 215 B.R. 739, 741 (Bankr.W.D.Ark.1997). The evidentiary value of variations in a debtor's petition, however, can work both ways; that is, the subsequent disclosure of information may show that the debtor was attempting to hide something. Or, it may simply be indicative of benign intent. *Bensenville Community Center v. Bailey (In re Bailey),* 147 B.R. 157, 165 (Bankr. N.D.Ill.1992).

■ In the end then, variations in a debtor's income and expense figures are just one of many possible factors from which the existence of those elements under § 727(a)(4)(A) may be distilled. As

was set forth by the Sixth Circuit Court of Appeals in addressing the elements of a § 727(a)(4)(A) cause of action:

Complete financial disclosure is a prerequisite to the privilege of discharge. The intent to defraud involves a material representation that you know to be false, or, what amounts to the same thing, an omission that you know will create an erroneous impression. A reckless disregard as to whether a representation is true will also satisfy the intent requirement. Courts may deduce fraudulent intent from all the facts and circumstances of a case. However, a debtor is entitled to discharge if false information is the result of mistake or inadvertence. The subject of a false oath is material if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.

*In re Keeney*, 227 F.3d at 685–86 (internal quotations and citations omitted).

■■■■ As detailed below, the evidence presented in this case, when viewed in the aggregate, including the logical inference which may be derived therefrom, does not support the existence of a *prima facie* case to sustain an action under § 727(a)(4)(A).

As an overall indicia of honesty, the Debtor's gross income, as listed in her petition and amended petition, corresponds closely to her tax returns and the representations she made on a loan agreement.

Those expenses listed by the Debtor in her petition for utilities, being higher than the actual monthly charges, can easily be account for by the existence of significant arrearages on the obligations. In a like manner, those variable expenses listed for her 401(k) loans can easily be explained by the Debtor making inconsistent and higher than re-

quired payments on the obligations. In this regard, it must be remembered that § 727(a)(4)(A) is only concerned with the honest disclosure of the expense, not its propriety.

It is also logical to conclude that variations in many of the Debtor's other monthly expenses are simply the result of fluctuations that are normal and commonly occur in a person's monthly budget. Or, if not the case, by the fact that the Debtor was getting her finances in order. In this respect, it is not uncommon that a debtor does not have, at or around the time a bankruptcy petition is filed, a complete handle on their finances. This is especially true of extraneous income and/or expenses that can be easily overlooked—e.g., in this case, an employer's car expense and mileage allowance, as well as expenses for employer provided benefits. Also, the Court is keenly aware that, in many instances, a debtor's monthly budget will fluctuate simply because required expenses are not actually paid every month.

A final miscellaneous point. The Plaintiff's argument that the Debtor overstated her withholdings appears to have been explained in his own exhibit, admitted into evidence over the Debtor's objection, wherein it was pointed out that the Debtor "alternates with the father of her child to claim the boy as her dependant." (Pl.Ex. No. 20, at pg. 2).

In the end, however, what is important is that once the mistake is realized, steps are taken to correct it. Here, this is exactly what happened; the Debtor filed two amendments to her bankruptcy petition, one of which revised her income and expense figures. On this matter, it has not gone unnoticed that the Debtor filed her amendments prior to the time and not in response to inquiries made at the first

meeting of creditors. Similarly, these amendments were filed prior to the time the Plaintiff commenced the instant adversary case. These points are especially critical; normally, a debtor, who by giving false information in their petition, intends to commit an act of fraud, will not voluntarily come forth with information until compelled by some external force.

■ Accordingly, for these reasons, the Plaintiff's Motion to Alter or Amend pursuant to Bankruptcy Rule 9023 will be Denied. As for the Debtor's counterclaim under 11 U.S.C. § 523(d),[1] this section requires a court to award attorney fees and costs to the debtor if it is found that the plaintiff position was not "substantially justified." This provision, however, is specifically limited to actions brought under § 523(a)(2), not as was suggested by the Plaintiff to actions brought to deny discharge brought under § 727(a). For this purpose, this Court, in addressing the Plaintiff's Complaint under § 523(a)(2), stated that it was "a rather close call ..." Thus, ruling *sub silentio* that the Plaintiff's complaint was "substantially justified," as that term is used in § 523(d), but, after Trial on the merits, it fell short of the evidentiary burden placed on the Plaintiff by bankruptcy law.

In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Decision.

Accordingly, it is

***ORDERED*** that the Motion of the Plaintiff, Dieter Weeber, to Alter or Amend Judgment pursuant to Bankruptcy Rule 9023 and Federal Rule of Civil Procedure 59, be, and is hereby, DENIED.

It is ***FURTHER ORDERED*** that the Motion of the Defendant/Debtor, Twana Boyd, for a Request for Ruling on Counterclaim, be, and is hereby, DENIED.

---

1. Paragraph (d) of § 523 provides, "[i]f a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust."